**UNITED STATES of America,
Plaintiff,**

v.

**MOON LAKE ELECTRIC
ASSOCIATION, INC.,
Defendant.**

No. 98–CR–228–B.

United States District Court,
D. Colorado.

Jan. 20, 1999.

Joseph Mackey, United States Attorney's Office, Criminal Division, Denver, CO, for plaintiff.

Peter R. Nadel, Gorsuch, Kirgis LLP, Denver, CO, Mark R. Gaylord, Suitter Axland, Salt Lake City, UT, for defendant.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

On June 9, 1998, the United States of America ("the government") filed an Information charging defendant, Moon Lake Electric Association, Inc. ("Moon Lake"), with seven violations of the Bald and Golden Eagle Protection Act ("the BGEPA"), 16 U.S.C. § 668 (1997), and six violations of the Migratory Bird Treaty Act ("the MBTA"), 16 U.S.C. §§ 703 & 707(a) (1997) (collectively, "the Acts"). in connection with the deaths of 12 Golden Eagles, 4 Ferruginous Hawks, and 1 Great Horned

Owl. Moon Lake moves for dismissal of the charges, arguing that the Acts do not apply to unintentional conduct that is not the sort of physical conduct normally exhibited by hunters and poachers. Moon Lake also argues that § 707(a) of the MBTA is unconstitutional as applied under the circumstances of this case. The issues are fully briefed and the parties presented oral argument on November 13, 1998. For the reasons set forth below, I deny Moon Lake's motion.

## I. BACKGROUND

I glean the following from the parties' briefs and oral arguments. Moon Lake is a "rural electrical distribution cooperative" that provides electricity to customers in northeastern Utah and northwestern Colorado. At issue in this case is Moon Lake's supply of electricity to an oil field near Rangely, Colorado. The electricity is conveyed by power lines strung across 3,096 power poles. The oil field is located near the White River in an area that is home to several species of protected birds, including Bald Eagles, Golden Eagles, Ferruginous Hawks, and Great Horned Owls. The oil field is mostly treeless, making Moon Lake's power poles preferred locations for perching, roosting, and hunting by birds of prey. The government alleges that Moon Lake has failed to install inexpensive equipment on 2,450 power poles, causing the death or injury of 38 birds of prey during the 29 month period commencing January 1996 and concluding June 1998.

As noted above, the Information charges Moon Lake with causing the deaths of 12 Golden Eagles, 4 Ferruginous Hawks, and 1 Great Horned Owl. Specifically, the Information alleges that Moon Lake did "take and kill" those 17 protected birds.

## II. LEGAL STANDARDS APPLICABLE TO MOTIONS TO DISMISS UNDER FEDERAL RULE OF CRIMINAL PROCEDURE 12(b)

Rule 12(b) states that "[a]ny defense, objection, or request which is capable of

determination without the trial of the general issue may be raised before trial by motion." Fed.R.Crim.P. 12(b). An information or indictment is deemed constitutionally sufficient if it: (1) contains the essential elements of the offense intended to be charged; (2) sufficiently apprises the accused of what he must be prepared to defend against; and (3) enables the accused to plead an acquittal or conviction as a bar to any subsequent prosecution for an identical offense. *Russell v. United States,* 369 U.S. 749, 763–764, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); *United States v. Walker,* 947 F.2d 1439, 1441 (10th Cir. 1991). Courts should test the sufficiency of an information or indictment by considering solely the allegations made, which allegations should be accepted as true for purposes of Rule 12(b). *United States v. Sampson,* 371 U.S. 75, 78–79, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962); *United States v. Hall,* 20 F.3d 1084, 1087 (10th Cir.1994). Generally, the strength or weakness of the government's case, or the sufficiency of the government's evidence to support a charge, may not be challenged by pretrial motion. *United States v. King,* 581 F.2d 800, 802 (10th Cir.1978). When a pretrial motion raises questions of fact intertwined with issues involving the merits, courts should defer determination of that matter until trial. *United States v. Knox,* 396 U.S. 77, 83, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969); *United States v. Self,* 2 F.3d 1071, 1082 (10th Cir.1993). Likewise, courts may defer determination of a constitutional question if the production of evidence will materially aid its determination. *See, generally,* WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL 2d § 194 (1982 & Supp.1998).

## III. WHETHER DEFENDANT'S ALLEGED CONDUCT CONSTITUTES A VIOLATION OF THE MBTA OR THE BGEPA

Moon Lake argues that the electrocutions, even if they occurred as alleged, do not constitute violations of the MBTA or the BGEPA because the electrocutions were unintentional and not caused by the sort of conduct normally exhibited by hunters and poachers. Moon Lake contends that, in proscribing the taking or killing of protected birds, Congress intended to target only poaching, hunting, trapping, and other "intentionally harmful" acts directed toward protected birds. In contending that its alleged conduct was unintentional, Moon Lake focuses on the *mens rea,* or mental state, required for conviction. By arguing that Congress intended to punish only conduct normally exhibited by hunters and poachers, Moon Lake directs my attention to the *actus reus,* or the physical act, required for conviction.

■ When courts interpret statutes, the initial inquiry focuses on the language of the statute itself. *United States v. James,* 478 U.S. 597, 604, 106 S.Ct. 3116, 92 L.Ed.2d 483 (1986); *Southern Ute Indian Tribe v. Amoco Production Co.,* 151 F.3d 1251, 1257 (10th Cir.1998) (en banc); F. Frankfurter. Some Reflections on the Reading of Statutes 16 (1947) ("Though we may not end with the words in construing a disputed statute, one certainly begins there."). Courts do not, however, read specific statutory language in isolation: courts " 'must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.' " *Southern Ute,* 151 F.3d at 1257 (quoting *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988)). If congressional will " 'has been expressed in reasonably plain terms, "that language must ordinarily be regarded as conclusive." ' " *Id.* (quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 570, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982) (quoting *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980))). Courts should assume Congress intended the words to be given their ordinary meaning, which may be discovered through the use of dictionaries. *United*

*States v. LaBonte,* 520 U.S. 751, 117 S.Ct. 1673, 1677, 137 L.Ed.2d 1001 (1997). While contemporaneous dictionary definitions of words in a statute are relevant, the existence of alternative dictionary definitions may themselves indicate that the statute is ambiguous. *Southern Ute* at 1257 (citing *Smith v. United States,* 508 U.S. 223, 228–229, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993), and *National R.R. Passenger Corp. v. Boston and Maine Corp.,* 503 U.S. 407, 418, 112 S.Ct. 1394, 118 L.Ed.2d 52 (1992)). Only if statutory language is ambiguous do courts resort to legislative history as an interpretive aid. *Toibb v. Radloff,* 501 U.S. 157, 162, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991); *United States v. Simmonds,* 111 F.3d 737, 742 (10th Cir.1997).

The MBTA states, in relevant part:

Unless and except as permitted by regulations made as hereinafter provided in this subchapter, it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for shipment, ship, export, import, cause to be shipped, exported, or imported, deliver for transportation, transport or cause to be transported, carry or cause to be carried, or receive for shipment, transportation, carriage, or export, any migratory bird, any part, nest, or egg of any such bird, or any product, whether or not manufactured, which consists, or is composed in whole or in part, of any such bird or any part, nest, or egg thereof. . . .

16 U.S.C. § 703. "Take" is defined as to "pursue, hunt, shoot, wound, kill, trap, capture, or collect." 50 C.F.R. § 10.12 (1997). Moon Lake does not argue that the Department of Interior's definition of the word "take" is arbitrary, capricious, or manifestly contrary to the MBTA. Accordingly, I defer to the Department of Interior's definition of "take" as a reasonable interpretation of the MBTA's plain language. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The BGEPA states, in relevant part:

Whoever, within the United States or any place subject to the jurisdiction thereof, without being permitted to do so as provided in this subchapter, shall knowingly, or with wanton disregard for the consequences of his act take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import, at any time or in any manner, any bald eagle commonly known as the American eagle, or any golden eagle, alive or dead, or any part, nest, or egg thereof of the foregoing eagles, or whoever violates any permit or regulation issued pursuant to this subchapter, shall be fined not more than $5,000 or imprisoned not more than one year or both. . . .

16 U.S.C. § 668. "Take" under the BGEPA "includes also pursue, shoot, shoot at, poison, wound, kill, capture, trap, collect, or molest or disturb. . . ." 16 U.S.C. § 668c.

### a. Whether the Acts Proscribe Only "Intentionally Harmful" Conduct

The plain language of the Acts belies Moon Lake's contention that the Acts regulate only "intentionally harmful" conduct. In *United States v. Corrow,* 119 F.3d 796 (10th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1089, 140 L.Ed.2d 146 (1998), the Tenth Circuit joined the majority of Circuit Courts of Appeal in holding that § 707(a) of the MBTA is strict liability crime. *Id.* at 805 (collecting cases). "Simply stated, then, 'it is not necessary to prove that a defendant violated the Migratory Bird Treaty Act with specific intent or guilty knowledge.'" *Id.* (quoting *United States v. Manning,* 787 F.2d 431, 435 n. 4 (8th Cir.1986)); *see also* S.Rep. No. 445, at 16, *reprinted in* 1986 U.S.C.C.A.N. 6113, 6128 ("Nothing in this amendment is intended to alter the 'strict liability' standard

for misdemeanor prosecutions under 16 U.S.C. § 707(a), a standard which has been upheld by many Federal court decisions."). Thus, whether Moon lake intended to cause the deaths of 17 protected birds is irrelevant to its prosecution under § 707(a).

The BGEPA, in contrast to § 707(a) of the MBTA, is not a strict liability crime. The BGEPA applies only to those who act "knowingly, or with wanton disregard for the consequences" of their acts. 16 U.S.C. § 668c; *see also* S.Rep. No. 92–1159, at 5, *reprinted in* 1972 U.S.C.C.A.N. 4285, 4289 (the defendant "must be conscious from his knowledge of surrounding circumstances and conditions that conduct will naturally and probably result in injury" to a protected bird). Accordingly, I reject Moon Lake's contention that the MBTA and the BGEPA prohibit only intentionally harmful conduct. Whether Moon Lake took or killed protected birds knowingly, or with wanton disregard for the consequences of its acts, is a question of fact for the jury's determination. As noted above, the strength or weakness of the government's case, or the sufficiency of the government's evidence to support a charge, may not be challenged by pretrial motion. *King,* 581 F.2d at 802.

### b. Whether the Acts Proscribe Only Physical Conduct Normally Associated with Hunting or Poaching

■ Moon Lake next argues that the Acts prohibit only physical conduct normally exhibited by hunters or poachers. After reviewing the plain language of the Acts, their respective legislative histories, and their designs as a whole, I disagree.

#### 1. *The MBTA*

The MBTA proscribes the acts of pursuing, hunting, taking, capturing, killing, possessing, offering for sale, selling, offering to barter, bartering, offering to purchase, purchasing, delivering for shipment, shipping, exporting, importing, delivering for transportation, transporting, carrying, and receiving. 16 U.S.C. § 703. The Secretary of the Department of the Interior ("the Secretary"), whose definition is not challenged by Moon Lake, defines "taking" as to "pursue, hunt, shoot, wound, kill, trap, capture, or collect." 50 C.F.R. § 10.12. The MBTA, when combined with the Secretary's definition of "take," thus prohibits the following types of conduct: pursuing, hunting, capturing, killing, shooting, wounding, trapping, collecting, possessing, offering for sale, selling, offering to barter, bartering, offering to purchase, purchasing, delivering for shipment, shipping, exporting, importing, delivering for transportation, transporting, carrying, and receiving. Considering the ordinarily understood meaning of these words, only hunting, capturing, shooting, and trapping identify conduct that could be construed as solely the province of hunters and poachers. In contrast, pursuing, killing, wounding, collecting, possessing, offering for sale, selling, offering to barter, bartering, offering to purchase, purchasing, delivering for shipment, shipping, exporting, importing, delivering for transportation, transporting, carrying, and receiving all constitute acts that may be performed without exhibiting the physical conduct normally associated with hunting and poaching.

By prohibiting the act of "killing" in addition to the acts of hunting, capturing, shooting, and trapping, the MBTA's language and regulations suggest that Congress intended to prohibit conduct beyond that normally exhibited by hunters and poachers. Indeed, the MBTA does not seem overly concerned with how captivity, injury, or death occurs. For instance, the MBTA forbids the sale of protected birds regardless of how such birds are collected, trapped, or killed. 16 U.S.C. § 668(a). One who finds a protected bird that died of natural causes in a field may not lawfully sell the carcass. *Id.* Nor may one who possesses bird parts lawfully killed before passage of the MBTA lawfully sell those bird parts after 1918. *Id.; Andrus v. Al-*

*lard,* 444 U.S. 51, 56, 61–62, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979) (both the MBTA and the BGEPA prohibit commerce in parts of protected birds, without regard to when those birds are originally taken). Further, in drafting the MBTA, Congress did not include any language that would suggest it intended to punish only those who act with specific motives. *See Andrus,* 444 U.S. at 56, 57, 59–60, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979) (describing the statutory prohibitions of the MBTA as "comprehensive," "exhaustive," "carefully enumerated," "expansive," and "sweepingly framed"). Notably, the MBTA proscribes taking and killing "by any means or in any manner." 16 U.S.C. § 703. If Congress intended to proscribe only capture, injury, and deaths that occur as a result conduct associated with hunting or poaching, Congress could have said so. Indeed, Congress has known that people in private and government sectors have interpreted the MBTA as proscribing conduct beyond the sort normally exhibited by hunters and poachers. *See, e.g., Agricultural Drainage Problems and Contamination at Kesterson Reservoir: Hearings before the Subcomm. on Water and Power Resources of the House Comm. on Interior and Insular Affairs,* 99th Cong. 10–19, 22–25, 30–39, 42–43, 45–51, 62–65, 104–110, 128–130, 150–151, 215, 523–524, 525–532, Serial No. 99–3 (March 15, 1985) (discussing in detail whether the Department of Interior violated the MBTA because of its operation of a contaminated reservoir in California's San Joaquin Valley).

Moon Lake cites five cases in support of its argument that the MBTA prohibits only physical conduct associated with hunting and poaching: *Seattle Audubon Society v. Evans ("Seattle II"),* 952 F.2d 297 (9th Cir.1991), *Newton County Wildlife Ass'n v. United States Forest Service,* 113 F.3d 110 (8th Cir.1997), *Curry v. United States Forest Service,* 988 F.Supp. 541 (W.D.Pa.1997), *Mahler v. United States Forest Service,* 927 F.Supp. 1559 (S.D.Ind. 1996), and *Citizens Interested in Bull Run, Inc. v. Edrington,* 781 F.Supp. 1502 (D.Or.1991). In each case, the plaintiffs attempted unsuccessfully to use the MBTA to enjoin proposed sales of national forest timber by the United States Forest Service. They alleged that habitat modification or destruction would injure or kill protected migratory birds. Each case is inapposite or unpersuasive.

*Seattle II* is the seminal case. In a consolidated appeal, the Seattle Audubon Society and the Portland Audubon Society appealed decisions by the Washington and Oregon district courts, both of which held that the MBTA does not prohibit the United States Forest Service ("the Forest Service") and the Bureau of Land Management ("the BLM") from selling and logging timber from lands within areas that may provide suitable habitat for the Northern Spotted Owl. *Id.* at 298–299. The Forest Service and the BLM cross-appealed the Washington district court's injunction prohibiting the logging of old-growth timber because the Forest Service failed to plan for the future survival of the Northern Spotted Owl, a violation, according to the Washington district court, of the National Forest Management Act, 16 U.S.C. §§ 1600–1687 (1985), and the Endangered Species Act of 1973, 16 U.S.C. §§ 1531–1543 (1985) ("the ESA"). *Id.* at 298. On review, the Ninth Circuit Court of Appeals affirmed the district courts' holdings. *Id.* at 302–303.

In affirming the district courts' holdings that the MBTA does not prohibit the Forest Service and the BLM from selling timber from lands within areas that may provide suitable habitat, the Court stated:

> Under the regulations promulgated pursuant to the MBTA, "take" is defined as to "pursue, hunt, shoot, wound, kill, trap, capture, or collect," or to attempt any such act. The definition describes physical conduct of the sort engaged by hunters and poachers, conduct which was undoubtedly a concern at the time of the statute's enactment in 1918. The statute and regulations promulgated under

it make no mention of habitat modification or destruction.

Under the Endangered Species Act enacted in 1973, in contrast, the word "take" is defined in a broader way to include "harass," and "harm," in addition to the verbs included in the MBTA definition. 16 U.S.C. § 1532(19). The broadest term, "harm," which is not included in the regulations under the Migratory Bird Treaty Act, is defined by ESA Regulation to include habitat modification or degradation. "Harm" under the Endangered Species Act definition of "take" means:

> [A]n act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering.

50 C.F.R. § 17.3. We agree with the Seattle district court that the differences in the proscribed conduct under ESA and the MBTA are "distinct and purposeful." The ESA was enacted in 1973. Congress amended the Migratory Bird Treaty Act the following year, but did not modify its prohibitions to include "harm." *See* Pub.L. 93–300 § 1, 88 Stat. 190 (1974). Courts have held that the Migratory Bird Treaty Act reaches as far as direct, though unintended, bird poisoning from toxic substances. *See, e.g., United States v. FMC Corp.*, 572 F.2d 902 (2d Cir.1978) (killing of migratory birds by dumping waste water); *United States v. Corbin Farm Serv.*, 444 F.Supp. 510 (E.D.Cal.), *aff'd on other grounds*, 578 F.2d 259 (9th Cir.1978) (deaths of birds resulting from misapplication of pesticides). In *FMC Corp.*, the Second Circuit imposed strict criminal liability for poisoning birds by analogizing to principles of strict tort liability arising from dangerous conditions or substances. 572 F.2d at 906–08. That case involved the manufacture of a highly toxic pesticide. *Id.* at 906. In *Corbin*

*Farm Serv.*, the district court simply held that the MBTA can "constitutionally be applied to impose criminal penalties on those who did not intend to kill migratory birds." 444 F.Supp. at 536. The reasoning of those cases is inapposite here. These cases do not suggest that habitat destruction, leading indirectly to bird deaths, amounts to the "taking" of migratory birds within the meaning of the Migratory Bird Treaty Act. We are not free to give words a different meaning than that which Congress and the Agencies charged with implementing congressional directives have historically given them under the Migratory Bird Treaty Act and the Endangered Species Act. Habitat destruction causes "harm" to the owls under the ESA but does not "take" them within the meaning of the MBTA.

*Seattle II*, 952 F.2d at 303. The Washington district court's opinion contains a similar analysis. *See Seattle Audubon Society v. Robertson ("Seattle I")*, 1991 WL 180099, *11 (W.D.Wash.1991) (unpublished opinion).

To the extent *Seattle II* holds that the MBTA does not preclude habitat modification or habitat destruction, it is inapposite and I express no opinion as to the correctness of that narrow holding. Here, the government brings criminal charges against a cooperative for the alleged deaths of 17 protected birds. In contrast, *Seattle II* was a civil case in which the plaintiffs sought a preliminary injunction preventing proposed timber sales by the Forest Service and the BLM. Although the plaintiffs in *Seattle II* perceived injury and death as imminent, no actual injury or death had occurred as a result of timber sales, which were only proposed at the time the plaintiffs requested injunctive relief.

To the extent *Seattle II* may be read to say that the MBTA regulates only physical conduct normally associated with hunting or poaching, its interpretation of the MBTA is unpersuasive. Foremost, the

Ninth Circuit Court of Appeals' distinction between an "indirect" and "direct" "taking" is illogical. By focusing on whether the taking is "direct" or "indirect," the Court conflates the causation element with the *actus reus* element. Although section 707(a) of the MBTA imposes strict liability, *Corrow, supra,* the government must prove that Moon Lake's power lines constitute the cause in fact, as well as the proximate cause, of death. *See United States v. Baycon Industries, Inc.,* 744 F.2d 1505, 1506–1507 (11th Cir.1984) (the government must prove causation in a criminal prosecution under the Rivers and Harbors Appropriation Act despite its imposition of strict liability); *United States v. Tex–Tow, Inc.,* 589 F.2d 1310, 1313–1314 (7th Cir. 1978) (causation is a required element in a civil action premised on the strict liability provision of the Federal Water Pollution Control Act); Wayne R. LaFave & Austin W. Scott, Jr., Criminal Law § 35, at 267 (1972) (referring to Model Penal Code § 2.03, which requires that the actual result be a "probable consequence" of the actor's conduct, as the "appropriate way in which to handle legal cause in strict liability cases"). *See, generally, United States v. Cordoba–Hincapie,* 825 F.Supp. 485 (E.D.N.Y.1993) (exhaustively discussing the historic roots and present status of strict liability crimes). While the proximate causation analysis necessarily requires the trier of fact to determine whether a particular type of physical conduct has a propensity to injure or kill a protected bird, that analysis is subsumed within the causation element and has no bearing on the particular types of physical conduct prohibited by the MBTA. The Ninth Circuit Court of Appeals' distinction between an "indirect" and "direct" taking or killing, therefore, is unpersuasive.

Next, the Ninth Circuit's distinction between "indirect" and "direct" conduct reads into the MBTA a *mens rea* of intent and ignores the strict liability nature of § 707(a). *See* Section III a, *supra.* And while I agree with the Ninth Circuit that related statutes may sometimes shed light upon a previous enactment, *Andrus,* 444 U.S. at 62, 100 S.Ct. 318, I fail to see how the amendment of the MBTA in 1974, one year after the ESA's passage, suggests that the MBTA regulates only physical conduct normally exhibited by hunters and poachers. The 1974 amendment to the MBTA is ministerial because it simply recognizes the execution of a treaty between the United States and Japan. *See* Pub.L. No. 93–300 (acknowledging The Convention between the Government of the United States of America and the Government of Japan for the Protection of Migratory Birds in Danger of Extinction, and their Environment, Mar. 4, 1972, U.S.–Jap., 25 U.S.T. 3329, T.I.A.S. No. 7990). It is of equal or greater import that Congress reviewed and substantively amended the MBTA in 1986 without attempting to vitiate the holdings of FMC (killing of migratory birds by dumping waste water violates the MBTA) and *Corbin Farm Service* (deaths of birds resulting from misapplication of pesticides violates the MBTA). The dumping of waste water and misapplication of pesticides are not physical acts normally associated with hunting or poaching.

The proper analysis is found in *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995). In *Sweet Home Chapter,* the plaintiffs, persons and entities dependent on the forest product industry, challenged the Secretary of Interior's regulation defining the term "harm" found in the ESA, 16 U.S.C. § 3(19). *Id.* at 692, 115 S.Ct. 2407. The ESA makes it unlawful for any person to "take" endangered or threatened species, 16 U.S.C. § 9(a)(1)(B), and defines "take" to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect." 16 U.S.C. § 3(19). The Secretary of the Interior further defines "harm" to include "significant habitat modification or degradation where it actually kills or injures wildlife." 50 C.F.R. § 17.3. The plaintiffs presented a facial challenge to the Secretary's defini-

tion of "harm," arguing that Congress did not intend the word "take" to include habitat modification and degradation. *Sweet Home Chapter* at 692, 115 S.Ct. 2407. A majority of the United States Supreme Court held that the Secretary's interpretation of the word "harm" is reasonable. The Supreme Court stated, in relevant part:

> [A]n ordinary understanding of the word "harm" supports [the Secretary's interpretation] .... The dictionary definition of the verb form of "harm" is "to cause hurt or damage: to injure." Webster's Third New International Dictionary 1034 (1966). In the context of the ESA, that definition naturally encompasses habitat modification that results in actual injury or death to members of an endangered or threatened species.

> Respondents argue that the Secretary should have limited the purview of "harm" to direct applications of force against protected species, but the dictionary definition does not include the word "directly" or suggest in any way that only direct or willful action that leads to injury constitutes "harm." Moreover, unless the statutory term "harm" encompasses indirect as well as direct injuries, the word has no meaning that does not duplicate the meaning of the other words that [the ESA] ... uses to define "take." A reluctance to treat statutory terms as surplusage supports the reasonableness of the Secretary's interpretation.

> \*    \*    \*    \*    \*    \*

> The Court of Appeals made three errors in asserting that "harm" must refer to a direct application of force because the words around it do. First, the court's premise was flawed. Several of the words that accompany "harm" in the [ESA's] ... definition of "take," especially "harass," "pursue," "wound," and "kill," refer to actions or effects that do not require direct applications of force. Second, to the extent the court read a requirement of intent or purpose into

the words used to define "take," it ignored [the ESA's] ... express provision that a "knowing" action is enough to violate the [ESA] .... Third, the court employed *noscitur a sociis* to give "harm" essentially the same function as other words in the definition, thereby denying it independent meaning. The canon, to the contrary, counsels that a word "gathers meaning from the words around it." *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961). The statutory context of "harm" suggests that Congress meant the term to serve a particular function in the ESA, consistent with but distinct from the functions of the other verbs used to define "take."

*Id.* at. 697–698, 701–702. Because Moon Lake does not challenge the Secretary's interpretation of the MBTA, and because the issue of habitat modification or degradation is not before me, *Babbitt* is factually inapposite. Nonetheless, the Supreme Court's method of analyzing legislative language is instructive.

Application of the *Sweet Home Chapter* analysis further demonstrates why *Seattle II* is unpersuasive here. As noted in *Sweet Home Chapter*, but not by the Ninth Circuit in *Seattle II*, the contemporaneous definitions of "kill" and "take" do not include the word "directly" or suggest in any way that only direct applications of force constitute "killing" or "taking." At the time of the MBTA's passage, the words "kill" and "take" were defined as follows:

**Kill**

... **2.** To deprive of life; to put to death; to slay. **3.** To deprive of vital or active quality; to destroy or ruin; to neutralize; to suppress; to put an end to .... **7.** To slaughter (an animal for food); hence, to convert a food animal into (beef, pork, or the like); as, to *kill* beef.

**Take**

**1.** To lay hold of; to grasp; seize; as, to *take* one's hand; to *take* one's hat and

gloves. 2. To gain control or possession of in any way; specif: **a** To seize or capture by force; as, to *take* prisoners; to *take* a fort; also, to arrest; as to *take* a thief. **b** To catch by trapping, snaring, or like means.... 3. To get and carry away; to bear away; to remove; abstract; as, to *take* eggs from a bird's nest. 4. Specif: ... **c** To remove from life; to cause to die; ... **e** To bear away as a purchase; to purchase; buy; ... **f** To get and take away wrongfully; to steal; ...

WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 1185 & 2107 (1st Ed.1920). Further, the doctrine of *noscitur a sociis* does not compel me to conclude that Congress intended the word "kill" to serve the same function as the words "hunting," "shooting," and "trapping." The MBTA's language suggests that Congress intended the term "kill" to serve a particular function, distinct from the functions of the other 18 types of proscribed conduct. To hold otherwise would deny the word "kill" independent meaning and essentially read that word out of the MBTA and the Secretary's definition of "take." *See Sweet Home Chapter* at 702, 115 S.Ct. 2407; BLACK'S LAW DICTIONARY 1060 (6th Ed. (Centennial Ed.) 1990) (defining *"noscitur a sociis"*). For these reasons, I decline to follow the Ninth Circuit's analysis. Again, I express no opinion regarding whether the MBTA is intended to preclude habitat modification or degradation. That issue is not before me. Rather, I reject here only that part of *Seattle II* which may be read to hold that the MBTA regulates only the sort of physical conduct exhibited by hunters and poachers. I also reject those cases that rely on, or incorporate by reference, that holding of *Seattle I* and *Seattle II*. Of the four remaining cases on which Moon Lake relies, three merely cite with approval *Seattle I* or *Seattle II*; they contain no meaningful analyses of their own. *See, e.g., Newton County*, 113 F.3d at 114; *Curry*, 988 F.Supp. at 548; *Citizens Interested in Bull Run*, 781 F.Supp. at 1502 (D.Or.1991).

Only *Mahler v. United States Forest Service*, 927 F.Supp. 1559 (S.D.Ind.1996), supplies a rationale independent from the analysis of *Seattle II*. In *Mahler*, the plaintiff, a private citizen, sought a preliminary injunction prohibiting the Forest Service's plan to cut fifty acres of diseased and dying pine trees in Hoosier National Forest. *Id.* at 1561. The plaintiff argued that the timber sale would "indirectly 'take' migratory birds by destroying their habitat" and "directly 'take' migratory birds" during nesting season. *Id.* at 1573. The district court held that, "[p]roperly interpreted, the MBTA applies to activities that are intended to harm birds or to exploit harm to birds, such as hunting and trapping, and trafficking in birds and bird parts. The MBTA does not apply to other activities that result in unintended deaths of migratory birds." *Id.* at 1579. In arriving at its holding, the district court noted the "complete absence of criminal prosecutions for bird deaths resulting from logging," *id.* at 1581, examined the legislative history of the MBTA, *id.* at 1580–1581, and rejected a broader reading of the MBTA as "offensive to reason and common sense." *Id.* at 1583.

To the extent *Mahler* relies on legislative history, it reads into the MBTA ambiguities that do not exist. Because Congress expressed its will in "reasonably plain terms," I regard the plain language of the MBTA as conclusive. *Southern Ute*, 151 F.3d at 1257. I do not regard the following language as vague or ambiguous: "it shall be unlawful at any time, by any means or in any manner, to ... kill ... any migratory bird." 16 U.S.C. § 703. Even if I were to construe the nature of physical conduct prohibited by the MBTA as ambiguous, my review of the legislative history leads me to believe that it is capable of supporting broad interpretations.

The MBTA, enacted by Congress and signed by President Woodrow Wilson in 1918, is one of the oldest conservation statutes in existence. Migratory Bird

Treaty Act of 1918, ch. 128, § 2, 40 Stat. 755 (1918). Congress passed the MBTA to effect the 1916 treaty between the United States and Great Britain (on behalf of Canada). See The Convention between the United States and Great Britain (on behalf of Canada) for the Protection of Migratory Birds, Aug. 16, 1916, U.S.–Can., 39 Stat. 1702, T.S. No. 628 (protecting three classes of birds: "migratory game birds," "migratory insectivorous birds," and "other migratory nongame birds"). Congress authorized the Secretary of Agriculture to make and publish all needed rules and regulations to implement the Act, the stated purpose of which is to "aid in the restoration of such birds in those parts of the United States adapted thereto where the same have become scarce or extinct, and also to regulate the introduction of American or foreign birds or animals in localities where they have not heretofore existed." 16 U.S.C. § 701. The United States subsequently executed similar treaties with Mexico, Japan, and the Union of Soviet Socialist Republics. *See, e.g.,* The Convention between the United States and Mexico for the Protection of Migratory Birds and Game Mammals, Feb. 7, 1936, U.S.–Mex., 50 Stat. 1311, T.S. No. 912; The Convention between the Government of the United States of America and the Government of Japan for the Protection of Migratory Birds in Danger of Extinction, and their Environment, Mar. 4, 1972, U.S.–Jap., 25 U.S.T. 3329, T.I.A.S. No. 7990; The Convention between the United States of America and the Union of Soviet Socialist Republics Concerning the Conservation of Migratory Birds and their Environment, May 23, 1972, U.S.–U.S.S.R., 29 U.S.T. 4647.

As suggested by *Mahler,* the MBTA's legislative history indicates that Congress intended to regulate recreational and commercial hunting. *See, e.g.,* 55 Cong.Rec. 4401 (June 28, 1917) (Statements of Sens. King and McLean: debating the potential conflict between the MBTA and of state game laws); 55 Cong.Rec. 4402 (June 28,

1917) (statement of Sen. Smith: "This law is aimed at the professional pothunter, [one who hunts game for food, ignoring the rules of sport]."). 55 Cong.Rec. 4813 (July 9, 1917) (Statement of Sen. Reed: "[The MBTA] proposes to turn ... powers over to the Secretary of Agriculture for the creation of zones, to tell white men when and where they can hunt, to make it a crime for a man to shoot game on his own farm...."); 55 Cong.Rec. 4816 (July 9, 1917) (Statement of Sen. Smith: "Nobody is trying to do anything here except to keep pothunters from killing game out of season, ruining the eggs of nesting birds, and ruining the country by it. Enough birds will keep every insect off of every tree in America, and if you will quit shooting them they will do it."); 56 Cong.Rec. 7357 (June 4, 1918) (statement of Rep. Fess: annual food losses caused by insects require protection of birds from "the market hunter"); 56 Cong.Rec. 7360 (June 4, 1918) (statement of Rep. Anthony: "[T]he people who are against this bill are the market shooters, who want to go out and kill a lot of birds in the spring, when they ought not to kill them, and some so-called city sportsmen, who want spring shooting just to gratify a lust for slaughter."); 56 Cong.Rec. 7376 (June 4, 1918) (statement of Rep. Kincheloe: "If you want the pothunters to disregard this solemn treaty we made with Canada and kill these migratory birds and stop their propagation, then you want to vote against this bill."); 56 Cong.Rec. 7447 (June 6, 1918) (statements of Rep. Tillman: "God made woodpeckers, meadow larks, wild ducks, and bobolinks for boys to shoot.... [I]t makes better soldiers of them, if they learn to shoot.").

The legislative history also suggests, however, that Congress intended the MBTA to regulate more than just hunting and poaching. *See, e.g.,* H.R. No. 65–243, at 2 (1918) (letter from Secretary of State Robert Lansing to the President) ("... the extension of agriculture, and particularly the draining on a large scale of swamps

and meadows, together with improved firearms and a vast increase in the number of sportsmen, have so altered conditions that comparatively few migratory game birds nest within our limits." (referenced by Rep. Baker during the House floor debate, 56 Cong.Rec. 7370 (June 4, 1918)); 56 Cong.Rec. 7371 (June 4, 1918) (statement of Rep. Walsh: "This act prevents people from killing."); 56 Cong.Rec. 7448 (June 6, 1918) (statement of Rep. Robbins: differentiating between the "shooting" of game birds and the "destruction" of insectivorous birds); 56 Cong.Rec. 7458 (June 6, 1918) (statement of Rep. Smith: "If we are going to have a treaty about migratory birds, let us have some place where they can come and remain safely and be a pleasure and companions.") At least one Congressman recognized a difference between the physical acts of hunting and killing. *See, e.g.,* 56 Cong.Rec. 7446 (June 6, 1918) (statement of Rep. Stevenson: "[Rep. Bland] says also that they can not hunt ducks in Indiana in the fall, because they can not kill them. I have never been able to see why you can not hunt, whether you kill or not. There is no embargo on hunting, at least down in South Carolina...."). Other Congressmen construed the MBTA as having a very broad scope:

If the Secretary ... does not want you to do so, you will never kill another duck or any bird protected by this bill, whether it is a game bird or not. Therefore, it seems to me that we ought not to adopt the bill. It is too far reaching.... [T]he bill provides that it shall be unlawful to take any bird or have in possession any part of a bird except in accordance with regulations adopted by the Secretary.... If he adopts such regulations, you cannot kill a bird or have any part of a bird in your possession. That is all there is to that.

56 Cong.Rec. 7364 (June 14, 1998) (statement of Rep. Huddleston); *accord* 55 Cong.Rec. 4399 (June 28, 1917) (statement of Sen. Reed, describing the MBTA as "absolutely prohibiting the killing of game anywhere under any circumstances"). Indeed, at least two Congressman anticipated application of the MBTA to children who act "through inadvertence" or "through accident:"

What are you going to do in a case like this: A barefoot boy, as barefoot boys sometimes do, largely through inadvertence and without meaning anything wrong, happens to throw a stone at and strikes and injures a robin's nest and breaks one of the eggs, whereupon he is hauled before a court for violation of a solemn treaty entered into between the United States of America and the Provinces of Canada.

56 Cong.Rec. 7454 (June 6, 1918) (statement of Rep. Mondell).

Gentlemen conjure up the idea that a bureaucracy will be created, and that every innocent boy who goes out to play upon the streets and breaks a bird's egg through accident is to be haled 500 miles away and punished as if he were committing an offense of the highest degree, and with all the rigors of the criminal law.

56 Cong.Rec. 7456 (June 6, 1918) (statement of Rep. Dempsey). And notably, the MBTA protects many species that are not considered game birds. *See* 56 Cong.Rec. 7357 (June 4, 1918) (statement of Rep. Fess: "I am in favor of protecting the birds. My admiration for our little friends of the air makes me unfriendly to the habit of killing off these winged visitors, whether game birds, migratory birds, or other species, if they are not nuisances.") 56 Cong. Rec. 7360 (June 4, 1918) (statement of Rep. Stedman: "[T]he purpose of this bill is to give effect to the convention.... Insectivorous migratory birds as well as migratory game birds are embraced in the terms of the treaty."); 56 Cong.Rec. 7364 (June 4, 1918) (statement of Rep. Huddleston: "[This bill] puts it within the power of the Secretary of Agriculture to forbid the killing of game birds as much as the killing of song or insectivorous birds. They are put on the same level."); 56

Cong.Rec. 7369 (June 4, 1918) (statement of Rep. Temple: "The birds dealt with are of three classes—migratory game birds, migratory insectivorous birds, and migratory nongame birds."); 56 Cong.Rec. 7453 (June 6, 1918) (statement of Rep. Green: "What are the enemies of insectivorous birds? These hunters gentlemen have been talking about? Who hunts insectivorous birds? Not anybody in my State or elsewhere hunts insectivorous birds.") *See also* 50 C.F.R. § 10.13 (listing approximately 925 protected bird species, many of which are not game birds and have not been hunted, traditionally, by humans).

Many Congressmen also suggested that the true purpose of the MBTA was a desire to maintain a steady supply of game animals for the upper classes:

[A]ssuming no kind of punishment is too sever for the boy who robs a bird's nest, I call attention to the fact that this bill does not protect game birds. Instead of being called "a bill for the protection of game birds," it ought to be named "a bill for the protection of game-bird hunters." The real purpose of this bill, so far as it applies to the game birds, is not to protect the birds, is not to give them life, but to fix it so that the ragged boys, the people far away in the country who have not bird dogs—to fix it so that the common people of the country can not get their fair share of the game and so that only those who are able to afford game preserves and fancy equipment for hunting and all the paraphernalia that goes with it—these 5,000 sportsmen that Maj. Stedman speaks about—can get the game. It is for the protection of these sportsmen. It is a sportsmen's bill, not a boy's bill; it is not a farmer's bill. So far as the game birds are concerned, it is not a bill that is intended for a moment to promote the interests of the plain people.... But they hitch it up with song-bird protection, with the protection of insectivorous birds, in order to get the support of the farmers, who want these birds to live.

56 Cong.Rec. 7364 (June 4, 1918) (statement of Rep. Huddleston); *accord* 56 Cong.Rec. 7366 (June 4, 1918) (statement of Rep. Bland: "The fellow who has the money and can get on a train and go down to a duck-shooting resort is the fellow who wants this bill passed...."); 56 Cong.Rec. 7375 (June 4, 1918) (statement of Rep. Focht: "It is evident to my mind that this bill is not designed so much to protect the insectivorous birds and benefit the huntsman of the masses as it is to facilitate the incursion of the exclusive hunting clubs."); 56 Cong.Rec. 7447 (June 6, 1918) (statement of Rep. Tillman: "It is in the interest of the game hog who belongs to an exclusive club and wants to go down to North Carolina or Louisiana or Florida and hunt game and kill by wholesale."); 56 Cong. Rec. 7449 (June 6, 1918) (statement of Rep. Caraway: "[F]or fear that some gentleman ... may be deprived of his winter shooting, God bless your heart, let the sovereignty of the State of North Carolina go into the scrap heap."); 56 Cong.Rec. 7454 (June 6, 1918) (statement of Rep. Mondell: "A peculiar thing about this kind of legislation is that it is frequently supported by arguments that are not representative of the real sentiments and purpose of those uttering them.")

As one can see, then, there is no clearly expressed legislative intent that the MBTA regulates only physical conduct associated with hunting or poaching. Even if I were to construe the nature of physical conduct prohibited by the MBTA as ambiguous, the legislative history of the MBTA supports differing interpretations. Though legislative history may be examined as a secondary source of a statute's meaning, "the weight such history is given in construing a statute may vary according to factors such as whether the legislative history is sufficiently specific, clear and uniform to be a reliable indicator of intent." *Miller v. C.I.R.*, 836 F.2d 1274, 1282 (10th Cir.1988).

As support for its interpretation of the MBTA, Moon Lake points to the historical

absence of criminal prosecutions for bird deaths caused by the operation of electrical power lines. *See Mahler* at 1581 (noting the "complete absence of criminal prosecutions for bird deaths resulting from logging"). Certainly, the government has prosecuted individual hunters and poachers, both recreational and commercial, for killing protected birds. *See, e.g., United States v. Corrow,* 119 F.3d 796 (10th Cir. 1997) (affirming conviction of artifacts dealer under the MBTA for selling eagle, owl, and hawk feathers); *United States v. Van Fossan,* 899 F.2d 636 (7th Cir.1990) (affirming conviction of homeowner under the MBTA for inadvertently poisoning two grackles and two doves with strychnine); *United States v. Mackie,* 681 F.2d 1121 (9th Cir.1982) (MBTA and BGEPA prosecution of two defendants who "offered to sell and sold whole eagles and eagle parts to undercover agents"); *United States v. Sandia,* 6 F.Supp.2d 1278 (D.N.M.1997) (MBTA and BGEPA prosecution for illegal possession and sale of a Golden Eagle skin and feathers). The government has also instituted at least five MBTA prosecutions against private companies, none of which exhibited physical conduct normally associated with hunting or poaching, for allegedly killing protected birds. *See, e.g., United States v. Stuarco Oil Co.,* 73–CR–129 (D.Colo., Aug. 17, 1973) (oil company charged with 23 counts for the death of 23 birds resulting from the company's failure to build oil sump pits in a manner that could keep birds away; defendant pled *nolo contendere* to 17 counts); *United States v. Union Texas Petroleum,* 73–CR–127 (D.Colo., July 11, 1973) (prosecution of oil company for maintenance of oil sump pit; disposition unknown); *United States v. Equity Corp.,* Cr. 75–51 (D.Utah, Dec. 8, 1975) (oil company charged with 14 counts for the death of 14 ducks caused by the company's oil sump pits; oil company pled guilty and was fined $7,000); *FMC,* 572 F.2d 902 (2d Cir.1978) (prosecution of pesticide manufacturer for dumping wastewater into a ten-acre pond, thereby causing the death of Horned Larks, Green Herons,

Canadian Geese, Ringbilled Gulls, Shortbilled Dowichers, Least Sandpipers, and Migratory Fringillids; manufacturer fined $1,800); *U.S. v. Corbin Farm Service,* 444 F.Supp. 510 (E.D.Cal.1978) (prosecution of pesticide dealer, owner of an alfalfa field, and airplane pilot for spraying an alfalfa field with Furadan, a registered pesticide, thereby causing the deaths of American Widgeons; defendants convicted of one count), *aff'd on other grounds,* 578 F.2d 259 (9th Cir.1978).

■ Considering the government's decision to prosecute oil companies, a pesticide manufacturer, and pesticide users for hazardous operation of oil sump pits, wastewater ponds, and pesticide applicators, Moon Lake cannot argue credibly that the MBTA has been in disuse. Although none of the referenced prosecutions related to the operation of electrical power lines, the civil law doctrine of "desuetude," assuming its viability in American jurisprudence, requires a showing of "long and continued non-use" of a statute that is "basically obsolete." *United States v. Elliott,* 266 F.Supp. 318, 325 (S.D.N.Y.1967) (discussing the origins of the doctrine of desuetude and questioning its present viability). *See also Potter v. Murray City,* 760 F.2d 1065, 1071 (10th Cir.1985) (rejecting the defendants' assertion that Utah's laws regarding polygamy had fallen into desuetude) (quoting *Elliott, supra*). The doctrine of desuetude does not require the government to prosecute every specific offense. Here, it is sufficient that the MBTA's purposes remain viable, the conventions with Canada, Japan, and Mexico continue as solemn obligations, and the government has recently instituted prosecutions under MBTA.

■ To the extent that Moon Lake argues selective enforcement, I note that "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation so long as the selection was not deliberately based upon an unjustifiable standard such as race, reli-

gion, or other arbitrary classification." *Potter,* 760· F.2d at 1071 (citing *United States v. Amon,* 669 F.2d 1351, 1355–1356 (10th Cir.1981)). *See also United States v. Blitstein,* 626 F.2d 774, 782 (10th Cir.1980) ("[M]ere failure to prosecute other offenders is no basis for a finding of denial of equal protection."). Moon Lake fails to show deliberate or conscious selectivity based on an unjustifiable standard. Accordingly, I reject Moon Lake's assertions of desuetude and selective enforcement.

As its final argument regarding the MBTA's proper scope, Moon Lake contends that the government's interpretation leads to absurd results. Again, Moon Lake relies on *Mahler,* which states:

> Even the courts that interpreted the language broadly expressed misgivings about its breadth, but they did not identify meaningful limits. In *United States v. FMC Corp.,* the Second Circuit upheld a criminal conviction on eighteen counts for bird deaths resulting from the defendant's release of toxic substances into a wastewater pond. The district court had imposed a fine of only $500 for the convictions, although the law permits a prison sentence of up to six months and a fine of $500 per violation. The jury was instructed that it should convict even if it found that the bird deaths were accidental or unintentional. 572 F.2d at 904. The Second Circuit brushed off as a *reductio ad absurdum* the defendant's argument that a corporate officer could be sent to prison for many years with consecutive sentences, and also treated as a reductio ad absurdum the government's claim that the statute prohibits killing birds "without limitation." *Id.* at 905. *See also United States v. FMC Corp.,* 428 F.Supp. 615, 617 n. 2 (W.D.N.Y.1977) (expressing misgivings about applying MBTA to deaths of birds caused by accident or by activity such as clearing land for housing, recreation, and highways).
>
> The Second Circuit commented: "Certainly construction that would bring every killing within the statute, such as deaths caused by automobiles, airplanes, plate glass modem office buildings or picture windows in residential dwellings into which birds fly, would offend reason and common sense." *FMC Corp.,* 572 F.2d at 905. Few would disagree. But the Second Circuit did not resolve this problem by offering a limiting construction of the statute. Instead, it responded to this problem as follows: "As stated in one of the early decisions under the Act, '[a]n innocent technical violation on the part of any defendant can be taken care of by the imposition of a small or nominal fine.' Such situations properly can be left to the sound discretion of prosecutors and the courts." *Id.* (citing *United States v. Schultze,* 28 F.Supp. 234, 236 (W.D.Ky.1939)). Such trust in prosecutorial discretion is not really an answer to the issue of statutory construction. Also, for many defendants who may well be quite law-abiding, the significance of having any federal criminal conviction cannot be diminished by the fact that the penalties are not terribly severe.

*Mahler,* 927 F.Supp. at 1582–1583.

I agree that courts should not rely on prosecutorial discretion to ensure that a statute does not ensnare those beyond its proper confines. *See Baggett v. Bullitt,* 377 U.S. 360, 373–374, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964) ("It will not do to say that a prosecutor's sense of fairness and the Constitution would prevent a successful ... prosecution for some of the activities seemingly embraced within the sweeping statutory definitions."); *Keyishian v. Board of Regents of Univ. of State of New York,* 385 U.S. 589, 599, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) ("It is no answer to say that the statute would not be applied in such a case."). While prosecutors necessarily enjoy much discretion, proper construction of a criminal statute cannot depend upon the good will of those who must enforce it.

Nonetheless, *Mahler* and *FMC* overlook an important and inherent limiting feature of the MBTA's misdemeanor provision: to obtain a guilty verdict under § 707(a), the government must prove proximate causation, also known as "legal causation," beyond a reasonable doubt. In this context, "proximate cause" is generally defined as "that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the accident could not have happened, if the injury be one which might be *reasonably anticipated or foreseen as a natural consequence of the wrongful act.*" BLACK'S LAW DICTIONARY 1225 (6th Ed.1990) (emphasis added); *see also id.* at 1226 (defining "proximate consequence or result"). Because the death of a protected bird is generally not a probable consequence of driving an automobile, piloting an airplane, maintaining an office building, or living in a residential dwelling with a picture window, such activities would not normally result in liability under § 707(a), even if such activities would cause the death of protected birds. Proper application of the law to an MBTA prosecution, therefore, should not lead to absurd results.

Other facets of the MBTA and its implementing regulations seek to avoid absurd results. For instance, § 711 permits "breeding of migratory game birds on farms and preserves and the sale of birds so bred ... for the purpose of increasing the food supply." 16 U.S.C. § 711. Section 704 authorizes and directs the Secretary "to determine when, to what extent, if at all, and by what means, it is compatible with the terms of the conventions to allow hunting, taking, capture, killing, possession, sale, purchase, shipment, transportation, carriage, or expert of any such bird." 16 U.S.C. § 704. In accordance with § 704, the Secretary has established when and how migratory birds may be taken, killed, sold, etc. *See, generally,* 50 C.F.R. § 19 (proscribing airborne hunting); 50 C.F.R. §§ 20.1–20.155 (establishing open seasons, hunting methods, bag limits, and various other rules for migratory bird hunting); 50 C.F.R. § 21 (establishing certain permit requirements); 50 C.F.R. § 21.12 (exempting, from the permit requirements, the Department of the Interior, state game departments, municipal game farms or parks, public museums, public zoological parks, accredited institutional members of the American Association of Zoological Parks and Aquariums, and public scientific or educational institutions); 50 C.F.R. §§ 21.13–21.14 (exempting captive-reared mallard ducks and other captive-reared migratory waterfowl); 50 C.F.R. §§ 21.28–21.29 (permitting falconry); 50 C.F.R. §§ 21.41–21.42 (allowing the issuance of depredation orders permitting the killing of migratory game birds "upon the receipt of evidence clearly showing that migratory, game birds have accumulated in such numbers in a particular area as to cause or about to cause serious damage to agricultural, horticultural, and fish cultural interests."); 50 C.F.R. §§ 21.43–21.47 (permitting the killing of certain depredating larks and sparrows in California, Purple Gallinules in Louisiana, jays in Washington and Oregon, Double-Breasted Cormorants at aquaculture facilities, and certain blackbirds, cowbirds, grackles, crows, magpies anywhere). Reasonable regulation by the Secretary, in conjunction with proper application of the law, which includes requiring the prosecution to prove proximate cause beyond a reasonable doubt under § 707(a), can effectively avoid absurd and unintended results.

### 2. *The BGEPA*

Congress modeled the BGEPA after the MBTA. Similar to the MBTA, the BGEPA proscribes taking, possessing, selling, purchasing, bartering, selling, purchasing, bartering, transporting, exporting, importing, pursuing, shooting, shooting at, poisoning, wounding, killing, capturing, trapping, collecting, molesting, and disturbing. 16 U.S.C. §§ 668(a) & 668c. Only taking, shooting, shooting at, capturing, and trap-

ping constitute acts normally associated with hunting and poaching. By prohibiting "poisoning," "killing," "possessing," "molesting," and "disturbing" in addition to the acts normally associated with hunting, the BGEPA, like the MBTA, suggests that Congress intended to regulate conduct beyond the sort engaged in by hunters and poachers. And, as does the MBTA, the BGEPA proscribes taking or killing "at any time or in any manner." 16 U.S.C. § 668(a). I conclude, therefore, that the plain language of the Acts prohibits the alleged conduct of Moon Lake. *See Andrus,* 444 U.S. at 56, 57, 59–60, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979) (describing the statutory prohibitions of the BGEPA as "comprehensive," "exhaustive," "carefully enumerated," "expansive," and "sweepingly framed"); *Mountain States Legal Foundation v. Hodel,* 799 F.2d 1423, 1427 (10th Cir.1986) (describing provisions of the BGEPA as "sweeping").

The BGEPA's legislative history, although sparse in comparison that of the MBTA, is less equivocal. In 1940, Congress passed, with little debate, "An Act for the Protection of the Bald Eagle." The stated purpose of the 1940 Act is succinctly summarized in its enacting clause:

"Whereas the bald eagle thus became the symbolic representation of a new nation under a new government in a new world; and

"Whereas by that act of Congress and by tradition and custom during the life of this nation, the bald eagle is no longer a mere bird of biological interest but a symbol of the American ideals of freedom; and

"Whereas the bald eagle is now threatened with extinction:

Therefore, be it enacted . . . ."

Act of June 8, 1940, c. 278, § 1, 54 Stat. 250. Congress amended the Act in 1962, extending protection to Golden Eagles. Act of October 24, 1962, Pub.L. No. 87–884, 76 Stat. 1246. The stated purpose of the 1962 amendment is similarly summarized in its enacting language:

Whereas the population of the golden eagle has declined at such an alarming rate that it is now threatened with extinction; and

Whereas the golden eagle should be preserved because of its value to agriculture in the control of rodents; and

Whereas protection of the golden eagle will afford greater protection for the bald eagle, the national symbol of the United States of America, because the bald eagle is often killed by persons mistaking it for the golden eagle. . . .

*Id.* The 1962 amendments to the act also authorize the Secretary of Interior to permit, when appropriate, the taking of eagles for various reasons, including "for the scientific or exhibition purposes of public museums, scientific societies, and zoological parks, or for the religious purposes of Indian tribes." *Id., codified at* 16 U.S.C. § 668a. Congress further amended the BGEPA in 1972, increasing its criminal penalties and reducing the *mens rea* required for conviction. Act of October 23, 1972, Pub.L. No. 92–535, 86 Stat. 1064. Notably, during congressional hearings on the 1972 amendments, eagle electrocution was discussed before the Senate Committee on Commerce:

Sen. Spong: What progress is being made in protecting eagles from electrocution in the West?

Mr. Hansen: We are very gratified to report that substantial progress has been made within the past year to correct this situation. Electrocution on power transmission poles in the West has been a low grade but constant source of eagle deaths for many years. The problem in general has been well identified and is now well understood. A great many specific electrocution sites have been located and corrective modifications to the power transmission system have been developed.

Cooperation between land and resource management agencies, both Federal and States, and the various power administrations, has been excellent. We are getting on top of this situation very well.

Mr. Reed: There is a meeting, Mr. Chairman, of the power companies, the National Audubon Society, the National Wildlife Federation, the Colorado Department of Fish and Game, Rural Electrification Administration and the Bureau of Sport Fisheries and Wildlife in September, in Denver, Colo., to again go over some of the emergency work that is being implemented by the power companies to get their stringers further apart. As you know, the great problem is when the bird lands with his wings outspread and takes off with his wings outspread. He can make contact between two wires and that will electrocute him. And, or course, the power line is a place which a bird of prey enjoys sitting on because he has a great view of the countryside and can see his prey. So they are naturally attracted. If the stringers are placed further apart it avoids the problem of accidental electrocution.

\*    \*    \*    \*    \*    \*

Sen. Spong: Please explain, with examples, what is gained by deleting "willfully" and substituting for it "knowingly or with negligent disregard for the consequences of his act."

Mr. Smith: Senator Spong, what we are addressing here is the difference between a person "willfully" committing an act and a person "knowingly" causing damage to a fish and wildlife resource. The current legislation under consideration indicates a person must knowingly cause damage to the resource. We feel that this type of language would certainly improve our authority for enforcement. The present language is "willful." We are suggesting the change to "knowingly."

Our position would have been much stronger in recent Eagle cases had we had the language that is being proposed. For example, if an individual in placing a poison should kill an eagle we have to prove that this was a wilful action. With the change in language this will indicate to us that if the person using the poison knows that the poison has the capability to kill wildlife, and is using it with negligent disregard for the consequences of his act, it makes our enforcement position much stronger.

Sen. Spong: So it would be easier to gain conviction?

Mr. Smith: Correct, sir.

Sen. Spong: What effect would the change in language have on power companies as far as the electrocution is concerned?

Mr. Smith: I know of no effect that this would have on present operation of power companies, Senator. We will provide a legal opinion to you on the impact of this language change on future transmission line construction.

*Bald Eagle Protection Act: Hearings on S.2547, H.R.12186, and H.R.14731 Before the Subcomm. on the Environment of the Senate Comm. on Commerce* (hereinafter *"Hearings "*), 92nd Cong. 22–24, Serial No. 92–63 (June 29, 1972) (statements of Senator William B. Spong, Jr. (Virginia); Henry Hansen, Acting Chief, Division of Management and Enforcement; Nathaniel P. Reed, Assistant Secretary of the Interior for Fish and Wildlife and Parks; and Spencer H. Smith, Director, Bureau of Sport Fisheries and Wildlife) (Congress passed the 1972 BGEPA amendments without floor debate.) The following opinion letter was subsequently submitted for the record:

We have your memorandum of July 19, 1972, inquiring as to the liability of power companies under the provisions of H.R.12186.

The proposed legislation, in accordance with the protection provided by the third clause of Section 9 of Article I of the United States Constitution, could not be interpreted as operating *ex post facto*. This means that the power companies would not be liable for acts committed prior to the date of enactment. However, since power lines have a tendency to destroy eagles, such lines erected after the date of enactment should provide such safeguards as are available in order for the power companies to avoid the charge of acting with "negligent disregard for the consequences" of their acts. This obligation would be no more of a burden upon power companies than upon any other person or organization performing operations which had a tendency to destroy wildlife. In every case, reasonable precautions would have to be taken to prevent the killing of eagles.

(Ltr. from C. Brester Chapman, Jr., Associate Solicitor, U.S. Department of the Interior, to Spencer H. Smith of 7/20/92, *reprinted in Hearings* at 24.) Thus, even if I did not regard the plain language of the BGEPA as conclusive, its legislative history suggests that it proscribes conduct beyond the sort typically exhibited by hunters and poachers.

In summary, I reject Moon Lake's argument that the Acts prohibit only physical conduct normally exhibited by hunters or poachers. After reviewing the plain language of the Acts, their respective legislative histories, and the judicial opinions cited by the parties, I conclude that the Acts must be interpreted as the government suggests. I next address Moon Lake's contention that § 707(a) of the MBTA is unconstitutional as applied under the circumstances of this case.

IV. WHETHER SECTION 707(a) OF THE MBTA IS UNCONSTITUTIONAL AS APPLIED UNDER THE CIRCUMSTANCES OF THIS CASE

As its final argument in support of dismissal, Moon Lake contends that the government's prosecution violates its "fundamental rights to due process" because § 707(a) of the MBTA, although a misdemeanor, imposes "criminal liability and stiff fines." Apparently unaware that the Tenth Circuit Court of Appeals already decided § 707(a) is a strict liability crime, *see Corrow, supra,* Moon Lake advocates against strict liability by contending that the MBTA is not a "public welfare offense" and imposes more than a "nominal fine." Because *Corrow* constitutes binding precedent in the District of Colorado, and because *Corrow* rejects the arguments raised by Moon Lake, I am also compelled to reject those arguments. Lastly, I note that Moon Lake, in support of its argument against strict liability, inaccurately calculates the potential fine for violation of § 707(a). *See United States v. Unser,* 165 F.3d 755 (10th Cir.1999). (describing potential penalty as "up to $5,000 or imprisonment of not more than six months, or both") (citing, *inter alia, Corrow* and 18 U.S.C. § 3571(b) (1987)).

Accordingly, I ORDER that defendant's motion to dismiss is DENIED.