UNITED STATES of America

v.

Michael J. ZAK, Jr., Defendant.

CR No. 06–30011–MAP.

United States District Court,
D. Massachusetts.

May 14, 2007.

Vincent A. Bongiorni, Springfield, MA, for Defendant.

Nadine Pellegrini, United States Attorney's Office, Boston, MA, for United States of America.

*MEMORANDUM REGARDING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, DEFENDANT'S MOTION TO DISMISS*

(Dkt. No. 49)

PONSOR, District Judge.

## I. *INTRODUCTION*

In an Information dated May 26, 2006, the government charged Defendant Michael J. Zak, Jr. with five misdemeanors: pursuing, hunting, taking, attempting to take, and attempting to kill great blue herons without permission in violation of the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. §§ 703 and 707(a), (Count One); pursuing, hunting, taking, attempting to take, and attempting to kill ospreys without permission in violation of the MBTA (Count Two); pursuing, hunting, taking, attempting to take, and attempting to kill a single bald eagle without permission in violation of the MBTA (Count Three); knowingly and with wanton disregard shooting at and killing the same bald eagle in violation of the Bald and Golden Eagle Protection Act ("BGEPA"), 16 U.S.C. § 668(a), (Count Four); and conspiring to

violate the MBTA, 18 U.S.C. § 371, (Count Five).

On March 23, 2007, Defendant pled guilty to Counts One, Two, and Five. On March 26, 2007, a jury-waived trial on Counts Three and Four commenced.

At the conclusion of the government's case-in-chief on March 29, 2007, Defendant moved for a judgment of acquittal, or in the alternative for dismissal of Counts Three and Four. Following the arguments of counsel, the court denied Defendant's motion without prejudice and instructed counsel to brief the issues raised by the motion.

On April 2, 2007, Defendant rested, and the court ordered the parties to return on April 10, 2007 for closing arguments. On that day, the court orally denied Defendant's motion for acquittal pursuant to Fed.R.Crim.P. 29. In doing so, however, the court noted that while the government's evidence was sufficient to convict Defendant of both counts, Defendant had made a strong argument that the MBTA Count was a lesser included offense of the BGEPA Count. The court further noted that if it found Defendant guilty of Count Four, it would consider dismissing Count Three.

After counsel made their closing arguments, the court found Defendant guilty of both counts and stated its findings of fact in open court. The court then dismissed Count Three on the basis of multiplicity.

The purpose of this memorandum is to set forth in greater detail the basis for the court's rulings denying Defendant's Rule 29 motion and dismissing Count Three.

## II. BACKGROUND [1]

Defendant owns and operates the Mohawk Trout Hatchery, a commercial fish growing enterprise located in the southeast corner of a sixty-acre parcel of land in Sunderland, Massachusetts.[2] On September 27, 2005, United States Fish and Wildlife Service ("USFWS") Agent Thomas Ricardi received information that Defendant was killing protected birds, and he went to the property with USFWS Agent Andrey Guidera to investigate.

As they approached the hatchery from the northwest, the two agents noticed the aroma of dead birds and soon discovered the remains of approximately 250 great blue herons within, or just over the boundary of, Defendant's property. Many of these carcasses were located at the base of a dead pine tree, the top of which was visible from the hatchery. After determining that Defendant had neither applied for nor received a depredation permit allowing him to take herons, Ricardi spearheaded what turned out to be a protracted investigation.

Following September 27, 2005, law enforcement agents surveilled the hatchery regularly. On one occasion, they heard gun shots on the property and observed Defendant yell at blue herons perched in the trees surrounding the hatchery. They also saw Defendant use a firearm, later identified as a .22 caliber Ruger rifle, to shoot into the woods in an apparent attempt to kill a heron.

After the birds migrated for the winter, the agents suspended their investigation.

---

**1.** The following background summary is provided for the benefit of those unfamiliar with the case. The facts summarized include both the facts the court found as the foundation for Defendant's conviction on Counts Three and Four and those relevant to the issues raised by Defendant's Rule 29 motion.

**2.** For a detailed description of the business and the property, see *United States v. Zak,* 476 F.Supp.2d 29, 31–32 (D.Mass.2007).

When they returned to the property on March 24, 2006, agents found several fresh heron carcasses, as well as the remains of a red-tailed hawk.

While conducting surveillance on Defendant's property on April 18, 2006, Ricardi observed large numbers of great blue herons and ospreys and caught his first glimpse of three bald eagles—two adults and one juvenile—circling overhead.[3]

On April 26, 2006, Ricardi saw the same three bald eagles again. Walking the perimeter of the hatchery, Ricardi also discovered three osprey carcasses and the remains of four more blue herons.

The following evening, Thursday, April 27, 2006, Ricardi made a thorough search of the property for evidence. The agents then suspended their surveillance at Defendant's property until Monday, May 1, 2006.

On that morning, Ricardi and USFWS Agent Eric Holmes arrived at the hatchery before dawn and established themselves on the slope of a hill overlooking the hatchery. At approximately 11:30 a.m., Ricardi left this position to look for dead birds.

As he approached the base of the dead pine tree, Ricardi saw a juvenile bald eagle lying face down with its wings shut and feet clenched. Based on the condition of the bird, Ricardi determined that it had been recently killed by a single gun shot. Forensic evidence later revealed that the bullet fragments found in the bird were consistent with .22 caliber ammunition.

On the morning of May 11, 2006, Ricardi led a team of federal and state agents to the hatchery to execute both a search warrant of the property and arrest warrants for Defendant and his son-in-law, Timothy Lloyd. Ricardi and Holmes placed Defen-

dant under arrest at approximately 7:30 a.m. After receiving *Miranda* warnings, Defendant agreed to speak with the agents.

During the course of the interview, which lasted several hours, Defendant stated that the hatchery had been experiencing problems with predatory birds taking fish from the farm's raceways and that he had been shooting them to "protect his livelihood," even though he knew they were protected by law. When asked why he had not sought to obtain depredation permits, Defendant answered that he believed such permits would put a limit on the number of birds he could kill. Defendant also volunteered that he had considered using protective netting, but determined that installing it would be too expensive.

Agent Holmes then stated that while he could sympathize with Defendant's resentment towards herons and ospreys, given their potential effect on his hatchery business, Defendant had crossed a line by killing a bald eagle. When Defendant appeared surprised by news of the dead eagle, Holmes asked if perhaps Defendant's son-in-law and Co–Defendant Lloyd might have been responsible for shooting the bird.

In response, Defendant stated that he was positive Lloyd did not shoot the eagle. Pointing in the direction of the dead pine tree, Defendant told Holmes that, if the eagle had been discovered in that vicinity, Defendant was "probably the one who shot it." Defendant then added that he typically only had a few seconds to take a shot, and if the eagle was the "big, brown hawk," he probably shot it.

---

**3.** The testimony of Tom French, the Acting Commissioner of the Massachusetts Department of Fish and Game, later established that juvenile bald eagles lack the distinctive white heads found on adult members of the species.

Although the evidence at trial revealed that Defendant was generally fond of eagles, testimony from former hatchery employees established that Defendant enjoyed killing birds—even birds such as red-tailed hawks who did not take his fish—and that he shot at them with abandon. Evidence also revealed that the dead pine tree was called "the hanging tree" since its height made it a favorite perch for birds, where they could be easily shot and where their bodies, caught up in falling, might regularly be seen dangling from branches.

## III. DISCUSSION

### A. Count Three.

#### 1. The MBTA.

"In 1916, the United States and Great Britain (acting for Canada) negotiated a treaty to protect migratory birds[,] ... whose pilgrimages traverse international borders. To effectuate this commitment, Congress enacted the MBTA in 1918." *United States v. Pitrone*, 115 F.3d 1, 2 (1st Cir.1997) (internal citations omitted).

According to several commentators, the primary impetus for the legislation was to reduce the country's insect population "and ensure a steady supply of food to sustain the war effort." Benjamin Means, Note, *Prohibiting Conduct, Not Consequences: The Limited Reach of the Migratory Bird Treaty Act*, 97 Mich. L.Rev. 823, 831 (1998) (citations omitted); *see also* Hye–Jong Linda Lee, Note, *The Pragmatic Migratory Bird Treaty Act: Protecting "Property"*, 31 B.C. Envtl. Aff. L.Rev. 649, 651–53 (2004) (citations omitted).[4]

In 1936, the United States entered into a second bilateral migratory bird convention with Mexico. *See* Convention between the United States of America and Mexico for the Protection of Migratory Birds and Game Mammals, Feb. 7, 1936, 50 Stat. 1311. Additional bilateral treaties with Japan and the former Soviet Union followed, and "Congress subsequently amended the MBTA to implement the other three conventions." *Fund for Animals v. Williams*, 246 F.Supp.2d 27, 37 (D.D.C. 2003), *vacated on other grounds by Fund For Animals, Inc. v. Hogan*, 428 F.3d 1059 (D.C.Cir.2005); *see also* Convention for the Protection of Birds and Birds in Danger of Extinction and Their Environment, U.S.-Japan, Mar. 4, 1972, 25 U.S.T. 3329; Convention Concerning the Conservation of Migratory Birds and Their Environment, U.S.-U.S.S.R., Nov. 19, 1976, 29 U.S.T. 4647.

The MBTA provides that, "[u]nless and except as permitted by regulations" promulgated by the Secretary of the Department of Interior, "it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, [or] attempt to take ... or kill ... any migratory bird .... included in the terms of the [four] conventions," to which the United States is a party. 16 U.S.C. § 703(a). Under the Act's misdemeanor provision, any person who fails to comply with the Act or "any regulation made pursuant to it ... shall be fined not more than $15,000 or be imprisoned not more than six months, or both." 16 U.S.C. § 707(a).

Bald eagles came within the purview of the MBTA in 1972 when the United States and Mexico amended their original treaty.

---

4. This interpretation finds support in *Missouri v. Holland*, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920) (Holmes, J.), which rejected a Tenth Amendment challenge to the MBTA on the ground that "nothing in the Constitution ... compels the Government to sit by while a food supply is cut off and the protectors of our forests and our crops are destroyed." *Id.* at 435, 40 S.Ct. 382.

*See* Agreement Supplementing the Agreement of February 7, 1936, U.S.-Mex., Mar. 10, 1972, 23 U.S.T. 260, 260; *see also United States v. Hardman*, 297 F.3d 1116, 1121 n. 10 (10th Cir.2002) (noting that bald eagles are also covered by the terms of the treaty with the former Soviet Union); 50 C.F.R. § 10.13 (2007) (listing the bald eagle among birds protected by the Act).

### 2. *Defendant's Arguments.*

In moving for a judgment of acquittal with respect to Count Three, Defendant asserted that: (1) the record evidence was insufficient to establish that the bald eagle is a migratory bird, as defined by the MBTA; (2) Count Three improperly failed to allege scienter; (3) the MBTA is unconstitutionally vague; and (4) Count Three was a lesser included offense of Count Four, which charged a violation of the BGEPA.

### a. *The MBTA's Scope.*

Although it is undisputed that bald eagles *are* protected by the MBTA, *see supra* Section III.A.1, Defendant argued that the government failed to introduce evidence of this fact during its case-in-chief. For its part, the government pointed to testimony from Agent Ricardi concerning the broad coverage afforded by the MBTA, and it asked the court to take judicial notice of the bald eagle's protected status pursuant to 50 C.F.R. § 10.13.

While the Federal Register Act requires courts to take judicial notice of federal regulations, *see Getty Petroleum Mktg., Inc. v. Capital Terminal Co.*, 391 F.3d 312, 325 n. 19 (1st Cir.2004) (per curiam) (citing

44 U.S.C. § 1507), in this case, there was no need to do so. During his direct examination on March 27, 2006, Ricardi testified that there are only three birds found in Massachusetts—English sparrows, common pigeons, and starlings—that are not protected under the MBTA. (Dkt. No. 53, Trial Tr. 16:15–21, Mar. 27, 2006.)

■ Given the fact that bald eagles are obviously present in Massachusetts and not among the unprotected birds noted by Agent Ricardi, the court concluded that this uncontroverted evidence was sufficient to establish the bald eagle's protected status under the MBTA. Alternatively, the court did, and does, take judicial notice of the eagle's protected status.

### b. *Scienter.*

■ Defense counsel argued that Defendant cannot be found guilty under the MBTA unless the government proved beyond a reasonable doubt that he *knew* the bird he was shooting was protected and intentionally shot it with that knowledge. Since no evidence was offered sufficient to support this inference, the argument runs, Defendant was entitled to be acquitted.

The vast majority of courts faced with the issue have concluded that the MBTA's misdemeanor provision is a strict liability offense. *See, e.g., United States v. Corrow*, 119 F.3d 796, 805 (10th Cir.1997), *cert. denied*, 522 U.S. 1133, 118 S.Ct. 1089, 140 L.Ed.2d 146 (1998) ("[I]t is not necessary to prove that a defendant violated the Migratory Bird Treaty Act with specific intent or guilty knowledge." (citation omitted)).[5]

---

**5.** The exception to this general rule seems to be in cases where defendants have been charged with hunting migratory game birds by aid of bait. For many years, the Fifth Circuit was "[u]nique among the circuits" in requiring the government to prove that defen-

dants "knew [ ]or should have known that the field was baited." *United States v. Sylvester*, 848 F.2d 520, 522 (5th Cir.1988).

However, in 1998, Congress amended the MBTA to eliminate strict liability for baiting. *See* Migratory Bird Treaty Reform Act of

Congress has also consistently referred to misdemeanor violations under the MBTA as strict liability offenses. When amending the MBTA to add scienter requirements for felony offenses in 1986, Congress was careful to note that "[n]othing in this amendment is intended to alter the 'strict liability' standard for misdemeanor prosecutions under 16 U.S.C. § 707(a), a standard which has been upheld in many Federal court decisions."

*United States v. Morgan,* 311 F.3d 611, 615 (5th Cir.2002) (quoting S.Rep. No. 99–445, at 16 (1986), 1986 U.S.C.C.A.N. pp. 6113, 6128).

As one district court has observed,

> This comment in favor of strict liability does not show any intention on the part of Congress to extend the scope of the MBTA ... to reach any and all human activity that might cause the death of a migratory bird. [Hunters] who accidentally kill a protected migratory bird ... may be charged with misdemeanors without proof of intent to kill a *protected* bird.... That does not mean, however, that Congress intended for "strict liability" to apply to all forms of human activity, such as cutting a tree, mowing a hayfield, or flying a plane.

*Mahler v. United States Forest Serv.,* 927 F.Supp. 1559, 1581 (S.D.Ind.1996) (emphasis in original).

Although the First Circuit has never had occasion to address the issue squarely, it too has recognized, in dicta, that § 707(a) does not require proof of scienter.

*See Pitrone,* 115 F.3d at 6 (noting that the MBTA's "misdemeanor provision ... impose[s] strict liability").[6]

Given the well established authority, and the explicit intent of Congress expressed in the legislative history, the court concluded that the overwhelming evidence that Defendant deliberately shot the eagle was sufficient to sustain a conviction beyond reasonable doubt, without proof that Defendant knew the bird's actual identity and protected status.

### c. *Vagueness.*

 "As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Gonzales v. Carhart,* —— U.S. ——, ——, 127 S.Ct. 1610, 1628, 167 L.Ed.2d 480 (2007) (citations omitted). According to the First Circuit,

> a criminal statute fails to provide fair notice if a person of ordinary intelligence, ... examining [only] the language of the statute, ... would be in some way surprised that it prohibited the conduct in question.

*Sabetti v. Dipaolo,* 16 F.3d 16, 17 (1st Cir.1994) (Breyer, C.J.), *cert. denied,* 513 U.S. 916, 115 S.Ct. 293, 130 L.Ed.2d 207 (1994) (internal quotation marks, citations, and emphasis omitted).

Significantly, the *Dipaolo* court went on to describe "the person of ordinary intelli-

---

1998, PL 105–312, 1998 HR 2807 (Oct. 30, 1998). The Act now prohibits the taking of migratory game birds "by the aid of baiting, or on or over any baited area, if the person knows or reasonably should know that the area is a baited area." 16 U.S.C. § 704(b)(1); 50 C.F.R. § 20.21(i).

**6.** In *United States v. Javier Angueira,* 951 F.2d 12 (1st Cir.1991), the court assumed that proof of scienter was required to sustain a guilty verdict for taking migratory game birds on or above baited fields. *Id.* at 15; *see supra* note 3. This appears to be the only time the First Circuit has ever reviewed a conviction under the MBTA's misdemeanor provision.

gence" as an individual "of common sense, with knowledge of common understanding[s] and practices, ... which he brings fully to bear in examining the language of the statute." *Id.* (internal quotation marks and citations omitted).

As noted above, the MBTA provides that, "[u]nless and except as permitted by regulations ... it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, [or] attempt to take ... or kill ... any migratory bird...." 16 U.S.C. § 703(a).

Because this broadly worded statute lacks a scienter requirement, it is not difficult to hypothecate instances where individuals might be surprised to learn that their conduct has run afoul of the MBTA. *See United States v. Rollins,* 706 F.Supp. 742, 744–45 (D.Idaho 1989) (finding the MBTA unconstitutionally vague as applied to an alfalfa farmer who inadvertently caused the death of a flock of geese by spraying recommended quantities of pesticides on his fields).[7] That being said, it is a bedrock principle of constitutional law that one whose conduct is clearly proscribed by a statute "cannot complain of the vagueness of the law as applied to the conduct of others." *Love v. Butler,* 952 F.2d 10, 13 (1st Cir.1991) (citations omitted).

In this case, the evidence showed that Defendant's wholesale shooting of migratory birds, including the eagle, was not an example of "common [hatchery] practices," analogous to the use of pesticides described in *Rollins.* *See* 706 F.Supp. at 744. Indeed, unlike the defendant in *Rollins,* who "tended his farm in the same manner as other area farmers," *id.,* this Defendant consciously eschewed the industry's most common predatory control

measure, *i.e.* protective netting, and instead deliberately and indiscriminately shot at and killed hundreds of protected birds.

Whatever vagueness might be hypothesized at the fringe of the MBTA's reach, Defendant's action fell in the clear and unambiguous center of the statute's prohibition. The Act was *not* unconstitutionally vague as applied to the facts of this case.

### d. *Multiplicity.*

The Fifth Amendment states that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. "Among the purposes for double jeopardy protection is the prevention of 'repeated prosecutions for the same offense....'" *United States v. Fornia–Castillo,* 408 F.3d 52, 69 (1st Cir.2005) (citation omitted).

■ In instances "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Id.* (quoting *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932)). "[I]f the crimes charged have the same elements, or if one is a lesser included offense of the other, double jeopardy at some point will bar the door." *United States v. Parrilla–Tirado,* 22 F.3d 368, 372 (1st Cir.1994).

■ In this case, a comparison of the elements of the two offenses at issue reveals that while the BGEPA demands proof that a defendant (1) knowingly or with wanton disregard for the consequences of his act (2) took (3) a bald eagle

---

7. For the view that Congress intended the MBTA to cover such circumstances, see *United States v. Moon Lake Elec. Ass'n, Inc.,* 45 F.Supp.2d 1070, 1080–82 (D.Colo.1999) (detailing the Act's legislative history).

(4) without permission, the MBTA merely requires evidence of an unauthorized taking of a migratory bird. According to the government, Count Three nevertheless remains viable because the MBTA alone requires proof that what Defendant took was a "migratory bird," while the BGEPA refers only to eagles.

This argument is unpersuasive. As the government has noted, the bald eagle *is* a migratory bird protected under the MBTA. The conclusion is therefore unavoidable that "proof satisfying the requirements [of the BGEPA will always be] sufficient for conviction under the MBTA." *United States v. Corbin Farm Serv.*, 444 F.Supp. 510, 535. (D.C.Cal.1978), *aff'd* 578 F.2d 259 (9th Cir.1978); *see also United States v. Mackie*, 681 F.2d 1121, 1123 n. 2 (9th Cir.1982) (acknowledging that "the BGEPA was modeled after and, in some respects, duplicates the offenses enumerated in the MBTA").[8] Accordingly, while an individual whose conduct violates both statutes "may be prosecuted under *either*," 35A Am.Jur.2d *Fish, Game, & Wildlife Conservation* § 70 (2007) (emphasis added) (citations omitted), the double jeopardy clause of the Fifth Amendment prevents the government from prosecuting such an individual under *both, see* 24A Fed. Proc., L.Ed. § 56:2209 *Criminal Enforcement of Bald & Golden Eagle Protection Act* (2006).

Based on the foregoing, the court has concluded that the MBTA constitutes a lesser included offense of the BGEPA, and upon finding Defendant guilty of Counts Three and Four, has allowed Defendant's motion to dismiss Count Three.

### B. *Count Four.*

#### 1. *The BGEPA.*

"In 1940, Congress passed, with little debate, 'An Act for the Protection of the Bald Eagle.'" *United States v. Moon Lake Elec. Ass'n, Inc.*, 45 F.Supp.2d 1070, 1086 (D.Colo.1999). Both the House and the Senate Report on the original act explained the law's purpose by citing a letter from the Acting Secretary of Agriculture, which begins:

> It is apparent to this Department from its long observations with respect to the wildlife of this country that there are those in any community in which an eagle may appear who are immediately seized with a determination to kill it for no other reason than that it is an eagle and a bird of large proportions.

*United States v. Fryberg*, 622 F.2d 1010, 1015 n. 10 (9th Cir.1980), *cert. denied*, 449 U.S. 1004, 101 S.Ct. 545, 66 L.Ed.2d 301 (1980) (citing H.R.Rep. No. 76–2104, at 1 (1940)).

As originally drafted, the text of the statute stated, in relevant part:

> [W]hoever ... without being permitted so to do ... shall take, ... at any time or in any manner, any bald eagle ... shall be fined not more than $500 or imprisoned not more than six months, or both.

Bald Eagle Protection Act, ch. 278, 54 Stat. 250 (June 8, 1940). Significantly, Section 4 of the Act initially defined "take" to include "pursue, shoot, shoot at, wound, kill, capture, trap, collect, or otherwise *willfully* molest or disturb." *Id.* (emphasis added).

Partly in response to evidence that juvenile bald eagles frequently were killed by

---

**8.** For the time being, bald eagles are also protected by the Endangered Species Act of 1973, 16 U.S.C. §§ 1531 *et seq. See* 50 C.F.R. § 17.11; *but see* S. Res. 146, 110th Cong. (Apr. 12, 2007) (noting that "the administration is likely to officially delist the bald eagle from both the 'endangered' and 'threatened' species lists ... no later than June 29, 2007").

individuals mistaking them for golden eagles, Congress amended the act in 1962 to extend protection to golden eagles. Act to Provide Protection for the Golden Eagle, Pub.L. No. 87–884, 76 Stat. 1246 (Oct. 24, 1962); *see also United States v. Friday*, No. 05–CR–260–D, 2006 WL 3592952, at *16 (D.Wyo. Oct.13, 2006). However, "the Act continued to define the term 'take' to include 'pursue, shoot, shoot at, wound, kill, capture, trap, collect, or otherwise *willfully* molest or disturb.'" Roberto Iraola, *The Bald and Golden Eagle Protection Act*, 68 Alb. L.Rev. 973, 975 n. 18 (2005) (citing 16 U.S.C. § 668c (1964)).

In 1972, "Congress, again aroused by the useless destruction and possible extinction of these great birds, amended the act to increase the penalty against and to lessen the degree of knowledge required to convict violators." *United States v. White*, 508 F.2d 453, 460–61 (8th Cir.1974) (Lay, J., dissenting). Congress accomplished the latter task by inserting the words "knowingly, or with wanton disregard for the consequence of his act" immediately before "take" in § 1 of the original act and by deleting the words "otherwise willfully" from the definition of "take" found in § 4.[9]

> As explained in the Senate Report:
> The change from "willfully" in the present law to "knowingly, or with wanton disregard for the consequences of his act" [wa]s intended to lessen the degree of knowledge required to be proven in order to convict violators. The word "knowingly" means that the offender knew what he was about to do and, with such knowledge, proceeded to do the act. The additional words "with wanton disregard for the consequences of his act"

were also added to lessen the degree [of] knowledge required to be proved in order to obtain a conviction under the Act. The evidence would have to show more than mere negligence; while there is no intent to injure, the person must be conscious from his knowledge of surrounding circumstances and conditions that his conduct will naturally and probably result in injury.

S.Rep. No. 92–1159 (1972), *reprinted in* 1972 U.S.C.C.A.N. 4285, 4289.

As amended, the BGEPA now states, in relevant part, that "[w]hoever, . . ., without being permitted to do so . . ., shall knowingly, or with wanton disregard for the consequences of his act take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import, at any time or in any manner, any bald eagle . . . shall be fined not more than $5,000 or imprisoned not more than one year or both." 16 U.S.C. § 668(a). The statute now defines "take" to include "pursue, shoot, shoot at, poison, wound, kill, capture, trap, collect, molest or disturb." 16 U.S.C. § 668c.

### 2. *Defendant's Arguments.*

In moving for a judgment of acquittal with respect to Count Four, Defendant relied principally upon two arguments: (1) the language employed by the Government in the Information failed to track the statute exactly; and (2) the adverb "knowingly" modifies not only the verb "take" but also the object of the taking, *i.e.* "a bald eagle." Thus, Defendant says, to obtain a conviction under the BGEPA, the government must prove beyond a reasonable

---

9. Congress accomplished the former objective by amending § 1 of the Act to increase "the penalty to be imposed against violators from up to $500 and/or 6 months in jail to up to $5,000 and/or 1 year in jail for the first of-

fense and up to $10,000 and/or 2 years imprisonment for each subsequent conviction." S.Rep. No. 92–1159 (1972), *reprinted in* 1972 U.S.C.C.A.N. 4285, 4288.

doubt that Defendant knew he was shooting an eagle.

### a. *The Charging Document.*

▮ Whereas the BGEPA prohibits a defendant, without permission, from "knowingly, *or* with wanton disregard for the consequences of his act[,] tak[ing] ... any bald eagle," 16 U.S.C. § 668(a) (emphasis added), the Information alleges that "the defendant, without being permitted by regulation, did knowingly *and* with wanton disregard, shoot at and kill a Bald Eagle" (Dkt. No. 9, Information 6) (emphasis added).

According to Defendant, this improper joining of "mutually exclusive methods of violating the statute" constitutes "a fatal variance between the statutory offense language and the allegation in the information." (Dkt. No. 49, Def.'s Mot. for J. of Acquittal 2.)

In addition, Defendant maintains that the "wanton disregard" allegation in the Information is defective due to the absence of the words "for the consequences of his act." Given the government's choice to prosecute him under this alternative tine of the statute, Defendant takes the position that Count Four must be dismissed for this reason as well.[10]

Each of these arguments is unavailing. First, while the BGEPA is written in the disjunctive, the First Circuit has determined that when a statute

> sets forth several different means by which an offense may be committed, it is permissible for a count in an [information] to allege all or several of these means in the conjunctive. A conviction on such a count will stand if the evidence establishing one or more of the means of commission alleged is sufficient to support a jury verdict.

*United States v. Garcia–Torres,* 341 F.3d 61, 66 (1st Cir.2003), *cert. denied,* 540 U.S. 1202, 124 S.Ct. 1467, 158 L.Ed.2d 121 (2004) (quoting *United States v. Barbato,* 471 F.2d 918, 922 n. 3 (1st Cir.1973)).

Second, although the Information omitted the words "for the consequences of his act," there is no requirement that each element of an offense "be set forth *in haec verba.*" *Barbato,* 471 F.2d at 921. Instead, it is well-settled that a charging document "must be read to include facts which are necessarily implied by the specific allegations made." *Id.* (citations omitted).

Here, the allegation in question clearly implied that Defendant's "wanton disregard" was "for the consequences of his act," when he knowingly shot a large brown raptor without regard for whether it was a bald eagle. Since Count Four sets forth this offense "with sufficient clarity to show a violation of law, and enables the accused to know the nature and cause of the accusation against him," *United States v. Fusaro,* 708 F.2d 17, 23 (1st Cir.1983), *cert. denied,* 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983), the court found that the government's departure from "the better practice" of tracking the statutory language with specificity, *Barbato,* 471 F.2d

---

10. At the outset of the trial, counsel for the government indicated that (for reasons that remain obscure) the prosecution would be relying primarily on the portion of the statute that prohibits taking an eagle "with wanton disregard for the consequences of his act." While the government did not abandon the alternative and simpler theory of guilt—*i.e.* that Defendant "knowingly" shot the eagle—it chose not to emphasize this organization of its proof.

The court is, of course, not bound by the government's fastidiousness. It found Defendant guilty under both rationales: (a) he "knowingly" shot the eagle; and (b) he shot the eagle with "wanton disregard for the consequences of his act."

at 921, did not render the BGEPA Count defective.

b. *Specific Intent.*

As noted above, except in circumstances inapplicable here, the BGEPA makes it unlawful for an individual to "knowingly, or with wanton disregard for the consequences of his act take, ... at any time or in any manner, any bald eagle." 16 U.S.C. § 668(a). According to Defendant, to establish his guilt under the "knowingly" prong of the statute, the government had to prove that Defendant knew that the bird he took was, in fact, a bald eagle.

For the reasons set forth below, it is beyond serious dispute that the government need *not* prove that a defendant knew the bird he was shooting was an eagle in order to obtain a conviction under the BGEPA.

It is axiomatic that "the starting point for interpreting a statute is the language of the statute itself." *In re LaFata*, 483 F.3d 13 (1st Cir.2007) (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980)). In this case, a straightforward reading of 16 U.S.C. § 668(a) confirms that the word "knowingly" modifies only the verbs that follow it (*i.e.* take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import). This adverb clearly cannot be construed to describe a Defendant's state of knowledge.

Even adopting the untenable assumption that the word "knowingly" is "neither precisely defined in the statute itself nor immediately obvious in the statutory context," *Pitrone*, 115 F.3d at 5, a cursory review of the BGEPA's context, including its "purpose and various background legal principles" *United States v. Gendron*, 18 F.3d 955, 958 (1st Cir.1994), *cert. denied*, 513 U.S. 1051, 115 S.Ct. 654, 130 L.Ed.2d

558 (1994), makes it emphatically clear that "knowingly" only refers to Defendant's behavior in deliberately retrieving his rifle and intentionally aiming and shooting, not to his state of awareness as to the specific identity of the bird he shot.

The history of 16 U.S.C. § 668 demonstrates that each step taken by Congress subsequent to the statute's enactment was designed to increase the protection afforded to bald eagles. Indeed, the intent of Congress as expressed in the legislative history accompanying the 1972 amendments could not be more plain. By removing the word "willfully" from the BEGPA in 1972, Congress flatly rejected the construction of specific intent urged by Defendant here.

As a result, the current version of the BGEPA

requires the government to prove a knowing act, but it does not require proof of willfulness. That makes a world of difference. "Knowingly" has a meaning distinct from "willfully" in the lexicon of statutory construction.... Thus, courts consistently have rejected arguments ... which posit that the term "knowingly," standing alone, requires the prosecution to show that the defendant knew his behavior was unlawful, instead interpreting "knowingly" ... to require no more than that the defendant know he was engaging in the prohibited conduct.... By contrast, "willfully"—a word which is conspicuously absent from [the BGEPA]—sometimes has been construed to require a showing that the defendant knew his behavior transgressed the law.

*Pitrone*, 115 F.3d at 6 (internal quotation marks and citations omitted).

In support of his claim that Congress intended "knowingly" to require more than evidence that he desired the consequences

of his actions, Defendant has relied almost exclusively upon *United States v. X–Citement Video,* 513 U.S. 64, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994). In that case, the statute in question provided, in relevant part:

(a) Any person who—

(1) knowingly transports or ships in interstate or foreign commerce by any means including by computer or mails, any visual depiction, if—

(A) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

(B) such visual depiction is of such conduct;

(2) knowingly receives, or distributes, any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer, or knowingly reproduces any visual depiction for distribution in interstate or foreign commerce or through the mails, if—

(A) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

(B) such visual depiction is of such conduct;

. . . .

shall be punished [by up to 10 years in prison].

*Id.* at 68, 115 S.Ct. 464 (citing 18 U.S.C. § 2252(a) (1988 ed. and Supp. V)).[11]

Ultimately, the Supreme Court found that while "the most natural grammatical reading" of 18 U.S.C. § 2252 "suggests that the term 'knowingly' modifies only the surrounding verbs," *Id.* at 68, 115 S.Ct. 464, such an interpretation would ignore the presumption "that some form of scienter is to be implied in a criminal statute even if not expressed," *Id.* at 69, 115 S.Ct. 464.

In reaching this conclusion, the Court cited *Morissette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), Justice Jackson's landmark decision that distinguished between statutes that "merely adopt[ ] into federal statutory law a concept of crime already so well defined in common law" and those that "creat[e] an offense new to general law, for whose definition the courts have no guidance except the Act." 342 U.S. at 262, 72 S.Ct. 240. Among the latter category of crimes, the *Morissette* Court noted the existence of certain "public welfare offenses," which "are not in the nature of positive aggressions or invasions, with which the common law so often dealt, but are in the nature of neglect where the law requires care, or inaction where it imposes a duty." *Id.* at 255, 72 S.Ct. 240. Frequently, the Court observed,

legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element. The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities.

*Id.* at 256, 72 S.Ct. 240.

Unlike the statutes at issue in *X–Citement Video* and *Morissette,* the BGEPA is obviously a public welfare offense. *See United States v. Allard,* 397 F.Supp. 429, 432 (D.Mont.1975) (characterizing the BGEPA as a "regulatory" law). Thus, un-

---

**11.** Congress subsequently amended the Act to increase the penalties to be imposed against violators. See Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003, Pub.L. No. 108–21, 117 Stat. 650 (Apr. 30, 2003).

der Justice Jackson's analysis, specific intent is not a necessary element.

■ Indeed, the statute has all the characteristics the First Circuit has recognized as defining the sort of statutory provision lacking a requirement of specific intent. The BGEPA: (1) "omits mention of [specific] intent"; (2) "seems to involve what is basically a matter of policy"; (3) imposes a standard that is, "under the circumstances, reasonable and adherence thereto properly expected of a person"; (4) carries a "relatively small" penalty; (5) "does not gravely besmirch [the reputation]" of one convicted of the misdemeanor; and (6) "is not one taken over from the common law." *Tart v. Commonwealth of Mass.*, 949 F.2d 490, 502 (1st Cir.1991) (citation omitted).

Most importantly, the BGEPA's legislative history contains an *explicit* pronouncement that Congress had never intended to require proof of specific intent. *Id.* (citation omitted). This clarity is in sharp contrast to more ambiguous laws. *See X-Citement Video*, 513 U.S. at 73, 115 S.Ct. 464 ("The legislative history of the statute . . . speaks somewhat indistinctly to the question [of what] 'knowingly' . . . modifies. . . ."); *Staples v. United States*, 511 U.S. 600, 618, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994) (commenting on the absence of a clear indication from Congress of its intent regarding scienter); *Liparota v. United States*, 471 U.S. 419, 424–25, 105 S.Ct. 2084, 85 L.Ed.2d 434 ("The legislative history of the statute contains nothing that would clarify the congressional purpose on [the mental state required].").

Finally, Defendant's position becomes even less tenable when one examines how courts have construed analogous provisions in other wildlife conservation statutes. In *Pitrone*, the defendant was charged with violating the felony provision of the MBTA, which makes it a crime to "knowingly . . . take by any manner whatsoever any migratory bird with intent to sell, offer to sell, barter or offer to barter such bird, or . . . sell, offer for sale, barter or offer to barter, any migratory bird." 16 U.S.C. § 707(b).

Like Defendant, the accused in *Pitrone* argued that the inclusion of the word "knowingly" in the statute necessitated proof of specific intent. 115 F.3d at 5. The First Circuit disagreed based, *inter alia*, on the fact that in amending § 707(b) to include "knowingly" as a scienter requirement, the Legislature explicitly noted:

> It is not intended that proof be required that the defendant knew the taking, sale, barter or offer was a violation of the subchapter, nor that he know the particular bird was listed in the various international treaties implemented by this Act.

*Id.* (citing S. Rep. 99–445 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6113, 6128).

*United States v. McKittrick*, 142 F.3d 1170 (9th Cir.1998), *cert. denied*, 525 U.S. 1072, 119 S.Ct. 806, 142 L.Ed.2d 667 (1999), posed a challenge to Section 11 of the Endangered Species Act ("ESA"), a provision providing criminal penalties for those who "knowingly" take protected species. *See* 16 U.S.C. § 1540. In that case, the defendant argued that "a violation of ESA section 11 requires the government to prove that he knew he was shooting a [gray] wolf," an endangered species under the Act. *McKittrick*, 142 F.3d at 1176.

Noting that Congress had amended Section 11 in 1978 to "reduce[ ] the standard for criminal violations from 'willfully' to 'knowingly,'" the Ninth Circuit rejected this contention, finding that "section 11 requires only that [the defendant] knew he was shooting an animal, and that the animal turned out to be a protected gray wolf." *Id.* at 1177 (citing H.R.Rep. No. 95–1625, at 26 (1978), *reprinted in* 1978

U.S.C.C.A.N. 9453, 9476); *see also United States v. St. Onge,* 676 F.Supp. 1044, 1045 (D.Mont.1988) ("The critical issue is whether the act was done knowingly, not whether the defendant recognized what he was shooting."); *United States v. Billie,* 667 F.Supp. 1485, 1493 (S.D.Fla.1987) ("[B]ecause it would be nearly impossible to prove that the average hunter recognized the particular subspecies protected under the [ESA] ..., the [g]overnment need prove only that the defendant acted with general intent when he shot the animal in question." (footnote omitted)).

Based on the foregoing, the court has rejected the construction of "knowingly" proffered by Defendant and concluded that term merely required the government to prove that Defendant shot the eagle "voluntarily and intentionally, not because of mistake or accident." Pattern Jury Instructions for the District Courts of the First Circuit, § 2.13 (1998).

Since the evidence demonstrated beyond a reasonable doubt that Defendant knowingly shot the eagle as it sat perched on the dead pine tree on the edge of his property, he was guilty of violating the BGEPA, regardless of whether he knew the juvenile bird was an eagle or, as he said, "a big brown hawk." [12]

## IV. *CONCLUSION*

For the reasons set forth above, Defendant's Motion for Judgment of Acquittal, or in the Alternative, Motion to Dismiss (Dkt. No. 49) was allowed in part and denied in part on April 10, 2007. Defen-

dant will appear for sentencing on June 27, 2007, at 2:30 p.m.

It is So Ordered.

---

**12.** It is worth noting that the evidence was also sufficient to support a conviction beyond a reasonable doubt for shooting the eagle "in wanton disregard for the consequence of his act."

Defendant for decades made a habit of killing large birds indiscriminately and by the hundreds, including birds like red-tailed hawks and crows that posed no threat to his fishery. He knew eagles ate fish and were in the area. The eagle, sitting on the pine tree, was roughly double the size of any hawk in Western Massachusetts, and Defendant took only a few seconds to aim and kill it.

The court therefore found Defendant guilty on both the "knowingly" and "wanton disregard" tines of the statute, with either theory alone sufficient to support the conviction.